STATE v. RUDOLPH REDIKER.[1]

March 19, 1943.

No. 33,377.

[1]Reported in 8 N. W. (2d) 527.

*John Ott* and *Neil Hughes,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, *Frank J. Williams,* County Attorney, and *Luther Sletten* and *Per M. Larson,* Assistant County Attorneys, for the State.

HENRY M. GALLAGHER, CHIEF JUSTICE.

Defendant was indicted for the murder of Mayme Rediker, his wife. He was convicted of manslaughter in the first degree and appeals from an order denying his motion for new trial.

Defendant and the deceased were married at Faribault, Minnesota, on August 8, 1936, and thereafter lived in Minneapolis, where they both worked. Defendant had been a representative for the American Linen Company for 24 years. Mrs. Rediker had been employed as a clerk by the Dayton Company for about eight years at the time of her death. He was 38 years old and she about 44. From the latter part of 1937 or the early part of 1938 until the spring of 1941, the Redikers lived in an apartment house at 1817 Second avenue south managed by Mrs. Alice Delaney. During the summer of 1941 they occupied a cottage at Lake Minnetonka. About November 1 they moved into an apartment in a building located at 205 West Fifteenth street, where they were living at the time of Mrs. Rediker's death.

Shortly after four o'clock in the morning of January 25, 1942, firemen were called to the Rediker apartment by defendant. They found the naked body of Mrs. Rediker lying on the bathroom floor, the upper part of her body extending toward and into the doorway between the bathroom and the adjoining hall. Her head, face, and arms were severely bruised. There was a cut at the corner of one eye and another cut at the side of her nose. Both of these wounds were bleeding. There was blood on the floor, wainscoting,

and door of the bathroom. There was vomit in the bathtub, but no water in it. A woman's dressing gown was lying on a chair in the bathroom. The furniture in the apartment appeared to be in order.

One of the firemen and defendant moved Mrs. Rediker into the living room. The firemen applied a resuscitator machine in an unavailing effort to revive her. While they were working on her the police came. One of them called the General Hospital for an ambulance, which arrived within a few minutes. Dr. John J. Sevenants, who came with the ambulance, examined Mrs. Rediker and pronounced her dead. The ambulance crew and Dr. Sevenants departed, and the morgue was called and the coroner summoned.

The circumstances surrounding the death were such that Rediker was taken into custody. Subsequent investigation disclosed these facts, which were testified to at the trial: While the Redikers were living at 1817 Second avenue, neighboring tenants heard swearing, scuffling, and threats coming from their apartment. Mrs. Rediker was seen from time to time with black eyes and bruises on her face, arms, and head. Mrs. Delaney, manager of the apartment house, called defendant into her office and told him that the other tenants were complaining about his beating his wife. She rebuked defendant about his conduct and warned him that if she ever read of Mrs. Rediker's death she would notify the police. Mrs. Delaney lived in the apartment building next door and did not hear any of the scuffling between defendant and his wife. She did, however, observe Mrs. Rediker's bruises. Other tenants in the building heard defendant on various occasions swear at his wife, and they heard Mrs. Rediker scream and cry, "Rudy, don't hit me again." They heard defendant swear and say, "Shut up or I'll kill you."

Some of the neighbors living near the cottage occupied by the Redikers at the lake testified to seeing Mrs. Rediker with black eyes and bruises. They also heard screams and commotion in the cottage. Some of Mrs. Rediker's relatives testified to seeing her one evening in bed with severe bruises about her face and

arms. They testified that defendant declined to call a doctor and that he said that he thought his wife was taking dope.

Two witnesses who occupied an apartment in the building next door to the Rediker apartment at 205 West Fifteenth street testified that on January 17, 1942, they saw a man strike a woman several times; that they called to the man to stop beating his wife or they would call the police; and that immediately the lights in the Rediker apartment went out and all was quiet. They also saw a man in the Rediker apartment kick a woman some time before the episode of January 17. Other persons living in the same building testified to hearing commotion, swearing, and scuffling in the Rediker apartment on several occasions prior to January 25.

The deceased, Mayme Rediker, went to her employment at Dayton's store the morning of January 24, which was Saturday. She worked all day and left the store after 5:30 p. m. She was seen shortly before six o'clock in Witt's market buying meat and groceries. She was seen at a little grocery in the neighborhood of the Rediker residence at about 7:30 that evening. At that time she paid up her charge account, purchased three bottles of beer, and left.

On the morning of January 24, defendant left his apartment home at about 8:00 or 8:30. He did not go to work that day but drove out to New Brighton. He returned to the city and stopped for beer at a place on Lake street. He then visited Nelson's Bar and Cafe on Eleventh street and Marquette avenue. This was around noon. It is not clear whether he left the cafe or, if so, at what time. He was there later in the afternoon. Around five o'clock he joined a party of four women and one man and sat with them in a booth for a time. Between 6:00 and 6:15 he went with the four women to help find a room for one of them. They drove in the car of one of the women and went to two different hotels where they inspected rooms. Defendant then left the women at about 7:30 in the evening and returned to Nelson's Bar, where he remained until it closed at two o'clock Sunday morning. During the course of the evening he drank whiskey and visited with men

whom he knew. When the bar closed he went across the street to a hamburger shop and had something to eat. Norman Kausal, the man in charge of the shop, testified that defendant came in shortly after 2:30 a. m. While there, defendant became involved in an altercation with three young men, during the course of which he was struck on the forehead. Blood started to flow from the injury on his forehead. The three young men thereupon left, and Kausal washed off defendant's wound and applied a first-aid adhesive bandage. Defendant had an unopened quart bottle of whiskey in his overcoat pocket. After Kausal had finished dressing his head, defendant took out the bottle, opened it, and poured three drinks, one for each of the attendants and one for himself. The attendants did not drink theirs, but defendant drank his. He then left and went to get his car, which was parked on Eleventh street. Kausal went along to help him find it and then returned to get his own car, which was parked behind the shop. In driving past defendant's car, Kausal saw that defendant could not get it started, so he offered to drive him home. Defendant locked his auto, left it there, and rode with Kausal. When they arrived in front of Rediker's apartment house, defendant asked Kausal to come in, but Kausal declined, saying that he wanted to get home. Kausal then drove on to his residence at 409 Ninth street southeast. He testified that it took him about 15 minutes to drive home, and that he arrived there at five minutes to four in the morning.

Anthony W. Stein, a witness for the state, testified in substance: He and his wife occupied an apartment immediately in front of the Rediker apartment at 205 West Fifteenth street at the time of Mrs. Rediker's death. He worked on a night shift and customarily finished work at three o'clock in the morning. On the morning of January 25, 1942, he arrived home at 3:35 a. m. His guest, a Reverend Hubert Harris from Illinois, got up and let him in. Stein then picked up a magazine, took it into the kitchen, and glanced through it. Between 15 and 10 minutes to four he went into his bathroom, which is separated from the Rediker bathroom

by an air shaft. He observed that the light in the Rediker bathroom was on, and he heard someone enter and turn the water on. He then heard swearing, and a man's gruff voice said "You." He heard a woman's voice. He then heard much thumping and footsteps on the tile floor of the Rediker bathroom. The noise then subsided and seemed to come from another room of the apartment, and then came again from the bathroom. The swearing, the voices, the footsteps, and the thumping continued for about 15 minutes—it sounded to him like "furniture being moved." Then he heard a terrific thump or "thob," which caused the building to vibrate. Then there was quiet for a few moments. He then heard footsteps running in the hall; then more footsteps; then he heard the fire department and saw the "pulmotor" machine stop in front of the apartment house.

Reverend Harris testified that he heard thumping, commotion, and voices on the morning of January 25 and later the footsteps in the hall and a fire siren.

Defendant testified that he arrived home about 3:45 on the morning of January 25. He entered his apartment and called to his wife. He got no response so called again. He took off his overcoat. Then he noticed that the light in the bathroom was on. He glanced in the bedroom and saw that his wife was not there. So he looked into the bathroom and saw her slumped over in the bathtub in about eight or ten inches of water. He took off his suit coat and attempted to lift her out. She partially slipped from his grasp at first, but he got her out. He turned her over the edge of the tub and attempted artificial respiration. Something came out of her mouth. He laid her back on the floor of the bathroom and rubbed her with a towel. He noticed blood gushing from her nose. He then ran down to the caretaker's apartment, roused the caretaker, and called the fire department. He and the caretaker then ran upstairs to the Rediker apartment, and within about a minute the resuscitator squad from the fire department arrived. Thereafter the police, the ambulance and doctor, the cor-

oner, and the morgue attendants came into the picture, as hereinbefore related.

Dr. Emil W. Johnson, the deputy coroner, who arrived at the scene of the tragedy on the morning of January 25 and was present at the autopsy performed upon the body later that morning, testified that in his opinion Mrs. Rediker died of concussion of the brain caused by blows to her face and head.

Dr. C. M. Roan, called by the state, testified: "She died by reason of persistent action on the part of some violent external force which jarred her brain, inflicted deep wounds on her face, drained her arteries of blood and reduced her physical resistance to the point of complete exhaustion. In my opinion, she died as a result of impact or traumatic shock."

Dr. Russell R. Heim, called by the state, in answer to hypothetical questions, assigned as causes of death "a forced external violence, causing a multiplicity of bruises, hematomas, * * * concussion of the brain and hemorrhage into the spinal canal; with a further contributory cause of gross external hemorrhage and extravasation, hemorrhage into the tissues of the human body. * * * A contributory cause would be shock, traumatic shock."

Dr. J. F. Corbett, on behalf of defendant, testified that in his opinion Mrs. Rediker died from alcoholism and that the injuries disclosed did not cause the death.

Upon the foregoing evidence the jury found defendant guilty of first degree manslaughter.

Defendant does not here contend that the evidence is insufficient to sustain the conviction. The showing made was sufficiently strong to warrant a conviction of murder in the first degree. Nor is it contended that the trial court erred in instructing the jury, but it is claimed that defendant is entitled to a new trial on these grounds: (1) Incompetent and hearsay testimony received over his objection; (2) misconduct of counsel for the prosecution; (3) misconduct of the state in "improperly interfering with the jury while in the performance of its duty."

■ The alleged errors pertaining to the admission of incom-

petent and hearsay testimony involve the testimony of several witnesses for the state, but the questions raised are so closely related that the subject matter may conveniently be considered under one subhead. As heretofore stated, defendant and his wife during the year 1940 lived in an apartment at 1817 Second avenue south managed by Alice Delaney. It appears that other tenants in the apartment complained to Mrs. Delaney about disturbances in the Rediker apartment, and she called defendant into her office on the evening of November 1, 1940, and told him of the complaints. The substance of the conversation can best be understood by quoting her testimony, which was received over defendant's objection. She testified:

"A. I told him that a tenant next door had heard him beat up his wife, and he said, 'Why, you don't think I would hit Mayme, do you?' And I told him what happened, which was that about between 12 and 1 o'clock there was a terrible screaming and noise coming from his apartment, and that this tenant said, 'Oh, Rudy, don't hit me again, don't hit me again,' and this tenant told me that Rudy said, 'God damn you, keep your mouth shut.' Then Mr. Rediker sat there. Then I told Mr. Rediker, I said, 'Mr. Rediker, that is exactly how murders happen, is a man like you being drunk and coming home and beating up your wife.' And he sat through that, and he never said anything. Then I said, 'Any man that will beat his wife is lower than a snake.' And I said, 'A man is yellow to beat up a woman like Mrs. Rediker, who works all day and comes home and gets your meals, then you come in at that time of the night and beat her like this tenant said you did.' And I told Mr. Rediker that if that ever happened again, that I had notified the tenants on that floor to call the police department, not to wait to try to get me to come over there to call the police department, and then call me. Then Mr. Rediker asked me if I wanted him to move. And I said no, not necessarily. I said, 'I am afraid if you move Mrs. Rediker out of this building that you might kill her,' I said, 'the way you beat her.' And I told Mr.

Rediker that if I ever picked up the newspaper and saw that Mrs. Rediker was dead, I would be the first one to call the police department. And Mr. Rediker left. I asked him to send his wife over then, and Mrs. Rediker came over."

Mrs. Delaney further testified that, following the conversation with defendant, Mrs. Rediker came to her apartment and that she had a bruised arm and her breast was black and blue.

Mrs. Delaney also testified that on an occasion about two months before defendant moved from the building which she managed she called at the Rediker apartment and found Mrs. Rediker sitting on the davenport crying; that she had a black eye and was applying towels to her head in an effort to reduce a bump on the side of her head; that there was a frying pan on the floor and spots of catsup and grease on the dinette wall, which necessitated cleaning and redecorating.

Mrs. Lottie Spooner, another witness for the state, testified that she was in a room adjacent to Mrs. Delaney's office at the time of the conversation between defendant and Mrs. Delaney. She related the substance of it and also testified that she had observed bruises and marks on Mrs. Rediker's person; that she had heard quarrelling and commotion from the Rediker apartment at various times; and that she once saw defendant slap Mrs. Rediker.

Eugene A. Dougherty and Eugene Bernath, police detectives, were assigned the duty of investigating the circumstances surrounding Mrs. Rediker's death. During the course of their investigation they interviewed Mrs. Delaney and procured a statement from her embodying the things she testified to. They later talked with defendant and confronted him with the information procured from Mrs. Delaney and inquired as to its correctness. Dougherty testified that defendant admitted having had a conversation with Mrs. Delaney, but denied that the substance of it was as related by her; that in answer to an inquiry whether he had ever struck his wife with his fists Rediker said: "No, he had never struck her with his fists but he had pushed her a few times; and that they had had the usual little family arguments, but he had

never at any time beaten his wife." Bernath testified to substantially the same matters as Dougherty, except that he read Mrs. Delaney's statement to defendant and testified that after hearing it defendant said: "You have to discount about 75 or 85 percent what those old hens got to say."

Defendant objected to the questions that brought out all of this testimony. The objections were renewed from time to time. The case comes here on a typewritten transcript consisting of 1,134 pages. It is somewhat difficult to determine just what part of the objectionable testimony was left in the record and what part was stricken, and counsel have not been very diligent in helping us separate the wheat from the chaff. However, at the close of the state's case defendant moved to strike from the record all of Mrs. Delaney's testimony and all of Mrs. Spooner's except that part wherein she testified to having seen defendant strike his wife on one occasion.

In response to that motion, the court struck from the record as hearsay that part of Mrs. Delaney's testimony relating to matters told her by others and embodied in her conversation with defendant, but permitted to stand her testimony of what she herself saw and heard. A similar ruling was made with reference to the testimony of Mrs. Spooner. We do not find that the testimony of Dougherty and Bernath in which they related the conversation told them by Mrs. Delaney was stricken from the record, nor does it appear that defendant requested that it be stricken at the close of his case or at the close of the state's case. At the beginning of the instructions to the jury the court said:

"To begin with, I want to state that the testimony of Mrs. Alice Delaney and the testimony of Mrs. Lottie Spooner, insofar as it had to do with statements that she made of what she heard others say, and likewise the testimony of Mrs. Spooner who claims to have been in the bedroom and heard those, and testified to what she heard, it is only that portion of the testimony that the Court has stricken out, feeling that it is based entirely upon hearsay, and brought about no admission or any statement against interest by

the defendant. So that I charge the jury to disregard that part of the testimony of Mrs. Delaney and Mrs. Spooner which had to do with the conversation that Mrs. Delaney claims to have had in her apartment with the defendant; but it is only that part of the testimony that is stricken out."

The testimony objected to was offered apparently on the theory that it constituted admissions by defendant. In the conversations here involved defendant sometimes failed to answer and at other times answered evasively. Accusations made directly to the defendant, coupled with unresponsiveness or evasiveness on his part, are admissible as admissions although the defendant does not in fact admit the truth of the accusations. And whether or not the circumstances were such that defendant would have denied them had he been innocent was a matter to be decided by the jury. His reaction to the accusations might be considered by the jury, and from it the jury was entitled to infer that he acquiesced in the statements and admitted their truth. State v. Plym, 43 Minn. 385, 45 N. W. 848; State v. Kerr, 162 Minn. 309, 202 N. W. 727; State v. Graham, 176 Minn. 164, 222 N. W. 909; State v. Brown, 209 Minn. 478, 296 N. W. 582. See also Annotation, 80 A. L. R. 1235. Such evidence is not offered "as proof of a fact asserted but as a predicate to the showing of the reaction of the accused thereto." 20 Am. Jur., Evidence, p. 483, § 570. Much of the testimony here assailed as incompetent was properly admissible to depict defendant's reaction and conduct. Some of it was not. It is difficult to separate the competent from the incompetent in an involved conversation, and about the only thing a trial court can do is to admit the testimony and later, on a proper motion, strike the incompetent part from the record. This we believe the trial court diligently endeavored to do. That some testimony was stricken which may have been competent cannot prejudice defendant. That the jury heard some incompetent testimony which was later stricken cannot, in the light of the entire record, be said to have prejudiced him. There were no exceptions to the instructions, and it does not appear that the court's attention was called, at the close of the

evidence, to the fact that any of the testimony now claimed to be prejudicial was left in the record.

Mrs. Maude Hughes, Mrs. Ruth Plum, and Mrs. Mabel Johnson, sisters of Mrs. Rediker, testified that they visited the Redikers at the lake about July 15, 1941, and that they observed that she was crying and had black-and-blue marks on her person. Defendant objected to this testimony upon the ground that it was too remote, incompetent, and immaterial and had no bearing upon the issues in the case. Loretta Kopp, a beauty operator, testified that Mrs. Rediker came to her place of business for a permanent wave during the first part of May 1941 and that she observed a bump on Mrs. Rediker's head. This was shortly before the Redikers went to the lake. She also testified that in the latter part of the summer of 1940 she saw Mrs. Rediker with a broken finger and a black eye. This testimony was also objected to by defendant.

There was ample evidence of frequent quarrels between defendant and his wife and of his abuse of her, from which the jury could draw inferences that the bruises and injuries testified to were inflicted by defendant. He gave his version of what caused the bruises and marks, but from all the testimony the jury could, and no doubt did, believe that defendant, over a period of several years, particularly on occasions when he had been drinking, pursued a course of abusive conduct toward his wife which culminated in the tragedy here involved. Evidence that Mrs. Rediker bore marks of assault would not alone be admissible. Where, however, there is, as here, evidence to connect the fact of her frequent bruises with noises and commotion, commingled with defendant's threats and curses emanating from their apartment, the evidence is admissible to show a course of conduct and a mental attitude of defendant toward his wife, and to show malice. State v. O'Donnell, 176 Iowa 337, 157 N. W. 870; Wever v. State, 121 Neb. 816, 238 N. W. 736. We conclude that the challenged testimony was properly admitted.

■ Defendant assigns as error certain conduct of the prosecuting attorney which he claims was prejudicial. On cross-examina-

tion the prosecutor asked defendant whether his wife remained silent as to his acts of misconduct in order to save the family reputation. The question was objected to and the objection sustained. A short time later the prosecutor propounded this question to defendant on cross-examination: "Q. Finally, you also beat your first wife?" Defendant's objection to the question was sustained, and on his motion it was stricken from the record. The court stated that "it should be disregarded." Both questions were improper. The one pertaining to defendant's treatment of his former wife was highly so and ordinarily would of itself require the granting of a new trial upon the ground that it was a "foul" blow. Viereck v. United States, 318 U. S. 236, 248, 63 S. Ct. 561, 87 L. ed. ..... But the record here contains such an abundance of testimony, some of which stands undisputed, of defendant's brutality toward deceased that it is not likely to have increased the unfavorable impression the jury must have had of him. We do, however, disapprove of the conduct of the prosecutor in asking the two questions, even though they are the only ones in the entire trial, lasting about three weeks, which are claimed to be prejudicial.

Dr. Herman O. McPheeters, who was Mrs. Rediker's physician, was called as a witness by the state, presumably for the purpose of testifying as to the conditions he found upon prior examinations of Mrs. Rediker. The testimony was objected to by defendant upon the ground that the doctor's information was confidential and the objection was sustained. At the close of the trial defendant's counsel said: "Counsel also in the course of his argument to the jury stated to them that Dr. McPheeters was here to testify for Mrs. Rediker, that he himself knew what his testimony was, and that we, the defense, would not permit Dr. McPheeters to speak on her behalf, of Mrs. Rediker. We except to it as highly prejudicial; that it was the court that made the ruling, and we were not the ones that barred her testimony," to which the court responded, "I will try and cover it in the charge." We do not find where the incident was referred to in the charge, nor does it appear that counsel for defendant made any request for a clarifica-

tion, if one was needed. The argument of the prosecutor was not a part of the record, so we have no way of knowing what he said except as stated in the exception. In any event, it does not appear to have been so prejudicial as to require a new trial.

Counsel for defendant also complains that the prosecutor in the course of his argument referred on a number of occasions to one of defendant's counsel as "Dr. Carlson." Relying on Rian v. Hegnauer, 210 Minn. 607, 299 N. W. 673, defendant contends that this was prejudicial error. As pointed out, the arguments are not a part of the settled case. Defendant's counsel stated that he had been referred to by the prosecutor as "Dr. Carlson" on five occasions during the prosecutor's argument, and he took exception to the remark as highly improper and highly prejudicial. Mr. Larson, the assistant county attorney charged with the indiscretion, stated: "If I referred to you as 'Dr. Carlson,' it is a mistake, that is all." He also said, "I don't know when I did it. I am talking, and I may have some doctor in mind, and I said 'Carlson,' and I said 'Mr. Carlson.'" No further reference was made to the matter, nor does it appear that the parties agreed on just what was said. On the state of the record we cannot say that the trial court erred in denying a new trial because of this statement. The trial court was in a better position than we are to appraise the harm, if any there was, resulting to defendant. In view of the length of the trial and the aggressiveness with which defendant's counsel endeavored to protect his every right, we believe that the record is unusually free from charges of misconduct.

■ The final point made by defendant on this appeal has to do with an incident which occurred while the trial was in progress. It appears that sometime during the course of the trial word reached the prosecuting officials and was conveyed to the court that one of the jurors, Mrs. Myrtle E. Kelly, had indicated in a conversation to some unknown or undisclosed person that "she believed that Mr. Rediker was guilty but she wasn't going to vote that way." With that as a lead, representatives of the state interviewed Mrs. Kelly's employer and several of her friends to as-

certain whether, to the knowledge of any of them, she had expressed herself concerning the case. It is very apparent from a reading of what transpired in the court's chambers after the trial that the rumor was wholly unfounded and that the investigation satisfied those making it that Mrs. Kelly had neither done nor said anything improper. She later voluntarily appeared before the trial judge and disclosed that, while she had some information that she was being investigated, she was of the opinion that the investigation was of a general nature and pertained to all of the jurors. She further disclosed that she had only mentioned the matter to one other juror and that it in no way influenced her action in the case. The point defendant makes is that the juror in question, having discovered that she was being investigated, would naturally be intimidated and be disposed to vote for conviction. While we do not approve of the method here followed, because of the consequences which could result, a careful reading of what transpired, as disclosed by the record, convinces us that there was no misconduct whatever on the part of the juror in question and no basis for the investigation, but that, in any event, the juror was not influenced by the investigation and the result was not affected. It follows that, while the point raised merits consideration, defendant was not prejudiced by the incident.

The order appealed from is affirmed.