**STATE of Minnesota, Respondent,**

v.

**James L. SCOTT, Appellant.**

**No. CX–91–2477.**

Supreme Court of Minnesota.

Dec. 11, 1992.

John Stuart, State Public Defender, Susan J. Andrews, Asst. State Public Defender, St. Paul, for appellant.

James L. Scott, pro se.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, William F. Klumpp, Asst. Attys. Gen., St. Paul, and Gaylord Saetre, Todd County Atty., Long Prairie, for respondent.

COYNE, Justice.

Defendant, convicted of first-degree murder in the April 14, 1990, shotgun slaying of Dale Yungk and sentenced to life in prison, contends on appeal, *inter alia*, that the prosecutor's use of a peremptory challenge to remove the only black person on the venire constituted racial discrimination in violation of the fourteenth amendment and that the admission of evidence of his separately-tried and nontestifying codefendant's extrajudicial confession to a mutual acquaintance in defendant's presence that defendant and he killed Yungk violated defendant's sixth amendment right of confrontation. We affirm.

Sometime between 2:00 and 7:00 a.m. on the morning of April 14, 1990, the victim was shot and killed in Todd County in a ditch next to County Road 9 near its intersection with U.S. Highway 10. His body was discovered there later that morning. Examination of his body revealed, among other things, three major shotgun wounds: to his buttocks, his mid-left back and the back of his head. The latter two wounds had been inflicted by a shotgun fired at close range. Moreover, it appears that the wound to the head was fired while the victim was lying face down.

The break in the case came on April 20, 1990, when Beverly Munoz, a St. Paul resident, gave St. Paul police a suitcase left with her by defendant and his friend, Robert Gassler. Contents of the suitcase included a sawed-off shotgun and eight shotgun shells. Ricky Foster, Munoz' stepson, later would testify at defendant's trial that on the afternoon of April 14, when his father and stepmother were out of state, defendant and Gassler came to the Munoz' residence and that defendant had a hand-gun and Gassler the sawed-off shotgun, which smelled of gun powder, as if it had been recently fired. Gassler cleaned the gun that afternoon. Defendant, who was still at the house on the 18th when Beverly Munoz returned, gave her the suitcase containing the shotgun and shells and told her to lock it in her bedroom. After an altercation with defendant and Gassler on the 19th, Munoz ordered defendant and Gassler to leave. The next day she turned the suitcase over to the police.

Subsequent investigation led police to connect defendant and Gassler and the shotgun to the murder of Yungk, who was an acquaintance of both defendant and Gassler.

State's evidence at defendant's trial connecting the two of them to the murder included:

(a) Testimony that (i) the shot size found in Yungk's body was number 6 shot, the same as that of the Federal Cartridge-brand shells found in the suitcase; (ii) shot cup wads recovered from a test firing of these shells could have been fired from the same gun as the shot cup wads found at the murder scene; (iii) pellets from the test firing and pellets found in Yungk's body were from the same box or from boxes of ammunition manufactured by Federal Cartridge on or about the same date;

(b) Evidence that Gassler and Yungk had been involved in an attempted burglary on January 14, 1990, that Gassler believed Yungk had "snitched" on him and that Gassler had threatened to kill Yungk for being a "snitch";

(c) Evidence that defendant and Gassler called Yungk's landlord shortly before midnight on April 13 trying to locate Yungk;

(d) Evidence that one Donald Jenson called Yungk's residence that evening and was told by an individual he believed was Yungk's roommate that defendant and Gassler had picked up Yungk;

(e) Testimony by a mutual friend, Veronica Yarbough, that on the morning of April 14 Gassler, in defendant's physical presence, told her they had killed Yungk

and left his body by the side of the road "to prove a point"; and

(f) Evidence from two prison inmates that defendant, shortly after being returned to prison for violating parole following Yungk's murder, confessed to each of them separately that Gassler and he had killed Yungk.

One of the two inmates was Joseph Meyers, a childhood friend of defendant. Meyers testified that defendant's confession was detailed: Defendant told him the murder took place when Gassler, Yungk and defendant were returning to the Twin Cities after a failed burglary attempt in the Todd County area. They stopped along the road "somewhere around Staples or Walker" so that defendant and Yungk could relieve themselves in the ditch at the side of the road. Defendant told Meyers that Yungk panicked and ran. Defendant reacted by grabbing the shotgun and shooting Yungk, who then fell in the ditch. Defendant walked up to Yungk, put the shotgun to his head and fired again. At this point, Gassler had left the car and caught up with defendant and Yungk. Defendant told Meyers that he gave the gun to Gassler and told him to shoot Yungk. Gassler complied by firing the shotgun into Yungk's head. Defendant then retrieved the three casings from the spent shells and later threw them away, along with the shoes he wore that night.

■ 1. We address first defendant's contention that the prosecutor's exercise of a peremptory challenge to strike the only African–American person on the venire constituted racial discrimination in violation of the fourteenth amendment and requires a new trial under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny.

In *Batson* the United States Supreme Court outlined a three-step process for trial court evaluation of a claim by a defendant that the prosecutor used a peremptory challenge with racially discriminatory intent. Later in *Hernandez v. New York,* — U.S. —, —, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991), the Court summarized the process as follows:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. [Citations omitted].

In *Powers v. Ohio,* — U.S. —, —, 111 S.Ct. 1364, 1366, 113 L.Ed.2d 411 (1991), the Court effectively removed the *Batson* requirements that in order to establish a prima facie showing of discriminatory challenge, the defendant has to show that *he* is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the *defendant's* race. *Powers* makes it clear that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." *Id.* In order to make a prima facie showing the defendant need show only, as the Court put it in *Batson,* that the relevant circumstances "raise an inference" that the prosecutor used the peremptory challenge to exclude a member of the venire "on account of" that person's race. 476 U.S. at 96, 106 S.Ct. at 1723.

This case, for whatever relevance it may have, is not a case involving an African–American victim, defendant, codefendant or any African–American witnesses. Nonetheless, under *Powers,* defendant had a right to object when the prosecutor exercised a peremptory challenge to remove the only African–American member of the venire from which the jurors were being selected.

Because the trial court ruled on the ultimate question of intentional discrimination, the question whether the defendant made a prima facie showing is moot. *Hernandez v. New York,* — U.S. —, —, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).

The next question then is whether the prosecutor articulated a race-neutral explanation for striking the juror in question. The prosecutor gave a two-part explanation: (a) the juror's family had *recently* been involved with the county sheriff's office as a result of her husband's using a gun in connection with his threat to kill her stepson, an incident that resulted in the husband's being required to receive counselling, and (b) the juror, when asked on *voir dire* if she would be able to follow the judge's instructions, replied "probably, yeah." Moreover, the prosecutor expressly denied that his exercise of the challenge was racially motivated.

The defense admits that this was "arguably" a facially neutral explanation. We hold that indeed it was a racially neutral explanation. Therefore, defendant had the burden of proving purposeful discrimination.

Defendant argues for the first time on appeal that the prosecutor's reason was pretextual because the prosecutor failed to consistently apply the same reasoning in determining whether to strike Caucasian jurors. In *Walton v. Caspari*, 916 F.2d 1352, 1362 (8th Cir.1990), the Eighth Circuit opined that pretext may be established by proving that "prosecutors use their peremptory challenges to exclude African–American venirepersons for a given reason or reasons, but then fail to apply the same reason or reasons to exclude similarly situated, white venirepersons." Defendant points to the fact that a number of the unchallenged Caucasian jurors revealed involvement with law enforcement officials, yet the prosecutor did not strike them. Specifically, one juror's grandson had been in juvenile court for stealing, but she stated that "he has cut most of us out of his life," adding that he no longer lived in the area. Another juror's brother-in-law had been convicted of a game violation several years ago. Another juror's two grandchildren had recently been in juvenile court for underage drinking. One juror pleaded guilty to DWI 3½ years before defendant's trial. One juror's uncle was convicted of burglary and incarcerated at the time of trial, but that juror had not spoken to her uncle for 13 years.

The short answer to defendant's argument is that the decision whether the defendant has proven that the prosecutor acted with discriminatory intent is essentially a factual determination which the trial court makes. If defendant believed that the prosecutor's explanation, which on its face was racially neutral, was a pretext, defendant should have presented the argument in a timely manner to the trial court. Then the prosecutor could have responded to the allegation and the trial court could have made a factual determination, based on all of the relevant evidence, whether or not the striking was racially motivated.

Since defendant did not do this, we cannot grant defendant relief unless the record on appeal clearly establishes as a matter of law that the prosecutor's neutral explanation was pretextual and that the striking of the juror was racially motivated. The record simply does not compel such a determination. At most the record on appeal shows that the prosecutor did strike one Caucasian juror whose responses indicated her brother had been charged with a serious felony offense and that the jurors whom the prosecutor did not strike each had (a) minimal involvement with law enforcement, (b) less recent involvement, and/or (c) the relative involved with law enforcement was not a member of the juror's household.

2. The other main claim raised by defendant on appeal is that the trial court violated defendant's sixth amendment right of confrontation by allowing Veronica Yarbough to testify that Gassler, the nontestifying separately-tried codefendant, had told her in defendant's presence shortly after the offense that they had killed Yungk.

 The admission of an out-of-court confession by a nontestifying separately-tried codefendant which implicates the defendant generally violates the defendant's sixth amendment right of confrontation unless the state establishes either that the statement is admissible under a firmly-rooted exception to the hearsay exclusionary rule or that the circumstances surrounding

the making of the statement show that the statement carries with it those particularized guarantees of trustworthiness that ordinarily accompany statements admitted pursuant to firmly-rooted hearsay exceptions. *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Thus, *e.g.*, the Court has held that a defendant's right of confrontation is not violated by the admission pursuant to the co-conspirator exception of a confession by a co-conspirator. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986); *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). The state in this case did not try to justify admission of the codefendant's confession under the coconspirator exception, Minn.R.Evid. 801(d)(2)(E), but argued that since defendant was present and said nothing when Gassler confessed to Yarbough, defendant's silence constituted an adoptive admission, Minn.R.Evid. 801(d)(2)(B), because he presumably would have spoken and denied his guilt if Gassler had been lying.

The difficulty with defendant's argument is that, although there was other evidence suggesting that defendant heard Gassler, Yarbough's testimony indicated that defendant may have been asleep when Gassler made the statement. This raises serious doubts as to whether the state established sufficient foundation for admission of Gassler's statement under Rule 801(d)(2)(B), particularly since we have said that ordinarily the surrounding circumstances must rather clearly establish that the defendant, by his response or lack of it to the statement made in his presence, intended to adopt the statement as his own. *State v. Shoop*, 441 N.W.2d 475, 482 (Minn.1989); *Village of New Hope v. Duplessie*, 304 Minn. 417, 425, 231 N.W.2d 548, 553 (1975); *State v. Rediker*, 214 Minn. 470, 480, 8 N.W.2d 527, 532 (1943).

We conclude, however, that any constitutional error in admitting the evidence in question was harmless beyond a reasonable doubt, *Coy v. Iowa*, 487 U.S. 1012, 1022, 108 S.Ct. 2798, 2803–04, 101 L.Ed.2d 857 (1988) and *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), particularly given the strength of the state's other evidence against defendant, which included confessions made by defendant himself to two other people and physical evidence connecting defendant to the shotgun that undoubtedly was used to kill Yungk.[1]

3. We have also addressed the issues raised by defendant in his pro se supplemental brief, including his claim that his "first and fourth amendment rights" were violated by the admission of a photocopy of a letter he wrote to someone from prison. There is no need to reach this issue because although defendant's trial counsel objected when the letter was introduced through the recipient witness, he objected only on the ground of relevancy. By not raising the constitutional issue in the trial court and giving the trial court an opportunity to rule upon it, defendant forfeited the issue.

Defendant also contends that expert testimony comparing pellets recovered from Yungk's body with pellets in the shells found with the shotgun connected to defendant and Gassler was false testimony. The short answer to this is that defendant was free to present expert opinion testimony of his own at trial to counter the testimony of the state's expert but failed to do so. The record on appeal contains nothing to support the argument that the state intentionally presented false expert testimony at trial.

Finally, defendant argues that the prosecutor committed misconduct in a number of respects at trial. The record on appeal fails to compel the conclusion that the prosecutor committed prejudicial misconduct.

In summary, defendant received a fair trial before a properly selected jury and was properly found guilty of first-degree

---

**1.** We also note, in this respect, that the prosecutor during closing argument made only one reference to defendant's silence during Gassler's confession to Yarbough: "Gassler tells her that they have killed Dale Yungk. The defendant is right there on the loveseat, I believe was the testimony."

murder on evidence that was overwhelming.

Affirmed.