**STATE of Minnesota, Respondent,**

v.

**Scott Edward STEWART, Appellant.**

**No. C5-92-2347.**

Supreme Court of Minnesota.

March 25, 1994.

Rehearing Denied May 27, 1994.

---

John Stuart, State Public Defender and Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Margaret H. Chutich, Asst. Atty. Gen., St. Paul, and Roger S. Van Heel, Stearns County Atty., St. Cloud, for respondent.

## OPINION

GARDEBRING, Justice.

The appellant, Scott Edward Stewart, was convicted of eleven counts of first degree murder in connection with the disappearance and death of Melissa Johnson, and was sentenced to life in prison without the possibility

of release under Minn.Stat. § 609.184 (1992). Appellant appeals his conviction on three grounds. First, he contends the peremptory challenge of a Native American venire person was discriminatory. Second, he argues that there was prosecutorial misconduct. Third, he claims autopsy photographs of the victim's body were erroneously admitted because they were irrelevant, cumulative and prejudicial. We affirm the conviction.

Melissa Johnson was last seen alive by her roommate at about 11:45 p.m. on July 8, 1991, when she left their home to walk their two dogs. Half an hour later, her roommate found one of the dogs on the porch of their home. At about 2:15 a.m. on July 9, her roommate called the police to report Johnson missing. Melissa's other dog was found two days later near Big Lake.

Appellant was arrested on July 12, 1991, after his mother called police and reported that appellant was at her house and wanted to turn himself in on a parole violation.[1] Appellant was given a Miranda warning, and informed that he was a suspect in Melissa Johnson's disappearance. Appellant stated he understood the Miranda warning and that he "had nothing to do with Missy's disappearance." When asked if he was familiar with the case, appellant responded that he was aware that her dog had been found. Appellant agreed to accompany the arresting officers to the area where the dog had been found, and, once in the area, began to recall details of the crime.

Appellant directed officers to a cabin on the shore of Big Lake, stating, "Oh, God. I washed my pants there." Appellant then directed officers down a road near the cabin, telling them that he had thrown a screwdriver and a .22 calibre pistol in the ditch nearby. Appellant also told officers that he remembered throwing a knife into the lake from the cabin's dock, giving the approximate distance and location. Police investigators later found the knife, screwdriver and .22 calibre pistol where appellant had described throwing them.

---

1. Appellant had been released on parole from prison on July 4, 1991, but was not escorted to, and never reported to the Minneapolis halfway house to which he had been discharged. His whereabouts were unknown until July 12, 1991.

Appellant directed officers to a grassy matted-down area in the woods which was stained with what appeared to be dried blood. Appellant also remembered a little black dog with a green leash and a black bucket. The bucket was found within 15 feet of that area. When asked if Melissa Johnson was near that area, appellant pointed down a slope. Officers found Melissa's body, naked and covered with foliage, about 15 feet away. Appellant stated that he kidnapped Melissa in St. Cloud, brought her to that area, killed her by slitting her throat, and then tried to wash the blood away with rainwater from the bucket. Appellant was taken to the St. Cloud police department where he gave a tape-recorded confession.

At trial, the state presented the testimony of the officers who had accompanied appellant to the scene of the murder, the taped confession, the evidence recovered at the scene, and witnesses who had seen someone resembling appellant driving a Camaro slowly and repeatedly past a young woman with a dog. The state also presented three witnesses who had heard appellant make incriminating statements while he was in prison or jail.

Appellant testified at his trial, admitting that he was present when Melissa was kidnapped, but blaming the murder on two other men. He testified that on July 8th he and these two other men stole a Camaro with the intent to use it to commit an armed robbery. When their robbery plans failed, they decided instead to "meet some ladies." They drove around for a period "harassing ladies" until one of appellant's companions suggested that they "just snatch one." Appellant testified that, at his companion's direction, he pointed a gun at Melissa Johnson and told her to get into the car. They then drove to Big Lake because he knew it was "a very, very remote area" and they wanted "to sexually assault Missy Johnson."

Appellant testified that along the way they stopped at a gas station where he bought gas and a box of Vivarin, most of which he consumed during the drive. He became dizzy and nauseous and did not want to get out of the car. His two companions got out of the car with Melissa and walked into the woods. The three returned to the car sometime near sunrise. Later, after walking away from his companions for about ten minutes, appellant returned to find Melissa lying face down on the ground with her throat cut.

Appellant testified that the three men drove back to the scene of the attempted robbery where they separated. Appellant then drove the Camaro to Maple Lake where he passed out. When he awoke, he returned to the scene, hid the body and disposed of his knife, pistol, bullets and screwdriver. He then drove to St. Paul, and met with his companions several times in the next couple of days. Appellant testified that when he turned himself in on July 12, he lied to officers about his involvement with Melissa Johnson's death to protect his two friends.

██ Appellant contends that he is entitled to a new trial because the prosecutor's use of a peremptory challenge to remove a Native American woman from the jury panel deprived that juror of her constitutional right to equal protection of the law.[2] The use of peremptory challenges to exclude persons from the jury solely on the basis of race is prohibited by the equal protection clause of the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 84, 106 S.Ct. 1712, 1716, 90 L.Ed.2d 69 (1986). The Supreme Court in *Batson* outlined a three-step process for trial court evaluation of a claim that the prosecutor used a peremptory challenge with racially discriminatory intent. The Court summarized the process in *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) as follows:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried

---

**2.** In *Batson v. Kentucky*, 476 U.S. 79, 87, 106 S.Ct. 1712, 1718, 90 L.Ed.2d 69 (1986) the Supreme Court recognized "that by denying a per- son participation in jury service on account of his race, the State unconstitutionally discriminate[s] against the excluded juror."

his burden of proving purposeful discrimination.

*Id.* In *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) the Court extended the *Batson* protection against purposeful racial discrimination to cases where the defendant's race differs from that of the excluded jurors.

■ A prima facie case of racial discrimination is established by showing that one or more members of a racial group have been peremptorily excluded from the jury and that circumstances of the case raise an inference that the exclusion was based on race. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722; *State v. Scott,* 493 N.W.2d 546, 548 (Minn.1992). In this case, the venire panel consisted of 60 persons including one Hispanic (who was disqualified because he was not a citizen), one Asian (who served on the jury), and one Native American. Appellant's challenge merely established that a racial minority was peremptorily excluded from the jury, but failed to show circumstances that raise an inference that the exclusion was based on race. There were no racial overtones to the case since both the defendant and the victim are white, and the type of questions asked of the Native American venire person mirrored those asked of other jurors. However, because the trial court proceeded to the second step in the process, we need not address whether appellant established a prima facie case of the discriminatory use of the peremptory strike.

Once a prima facie showing is made, the burden then shifts to the prosecutor to articulate a race-neutral explanation for striking the juror in question. *Batson,* 476 U.S. at 94, 106 S.Ct. at 1721. In summary, the prosecutor felt that her answers came too quickly, and were flippant and inappropriate. He was also concerned about the fact that her brother was a drug user who may have been involved in activities similar to appellant's. The prosecutor expressly denied that his use of the peremptory challenge was racially motivated.

The third step in the *Batson* analysis is for the trial court to rule on whether the prosecutor's response is genuine and not a pretext for discrimination; its ruling is entitled to great deference on review. *State v. Everett,* 472 N.W.2d 864 (Minn.1991). In this case, the trial court's ruling must be inferred from his comments following the prosecutor's explanation. The judge stated: "All right; the record is made." Defense counsel made no further challenge to the prosecutor's explanation at that time. Appellant argues that a new trial is required because of the trial court's failure to rule explicitly that the prosecutor's proffered reasons were race neutral.

■ We agree that "the trial court has the duty to decide if there has been purposeful discrimination." *State v. McRae,* 494 N.W.2d 252, 257 (Minn.1992) (citing *Hernandez,* 500 U.S. at 359, 111 S.Ct. at 1866; *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723). However, while the trial court's duty to rule on the challenge is important, a new trial is not automatic where the court fails to rule explicitly. A similar issue came before this court recently in *State v. Scott,* 493 N.W.2d 546 (Minn.1992). In *Scott* the defendant argued for the first time on appeal that the prosecutor's reason was pretextual because the same reasoning was not applied to Caucasian jurors. *Id.* As we stated in *Scott,*

> If defendant believed that the prosecutor's explanation, which on its face was racially neutral, was a pretext, defendant should have presented the argument in a timely manner to the trial court. Then the prosecutor could have responded to the allegation and the trial court could have made a factual determination, based on all of the relevant evidence, whether or not the striking was racially motivated.
>
> Since the defendant did not do this, we cannot grant defendant relief unless the record on appeal clearly establishes as a matter of law that the prosecutor's neutral explanation was pretextual and that the striking of the juror was racially motivated.

*Id.*

In this case the trial judge heard the explanation of the prosecutor and, in the absence of further objection by the defense counsel, moved on to the next juror. By this action it can be inferred that he was satisfied with the prosecutor's explanation. On these

facts, it was reasonable for the trial court to construe defense counsel's failure to follow up on his *Batson* objection as an agreement that the expressed reasons were racially neutral. *See Hopson v. Fredericksen,* 961 F.2d 1374, 1378 (8th Cir.1992). We conclude that, on this record, there is no evidence that the prosecutor's use of the peremptory challenge was racially motivated, and therefore, the failure of the trial court to rule explicitly on the *Batson* challenge does not require a new trial.

We recognize, however, that the record will not always support the prosecutor's stated reasons as it does here, and therefore we stress the need for trial judges to fulfill their role in reviewing and ruling on the prosecutor's explanation for the challenge. The trial court has a duty to decide if there has been purposeful discrimination. *McRae,* 494 N.W.2d at 257. That duty should be carried out explicitly.

Appellant next argues that he was deprived of a fair trial because of improper statements by the prosecutor. During cross-examination the prosecutor characterized appellant's testimony as "crap," and during closing argument the prosecutor twice referred to appellant's testimony as a "performance." In neither case did defense counsel object. It is improper for an attorney to assert a personal opinion on the credibility of the defendant as a witness during closing argument. *State v. DeWald,* 463 N.W.2d 741 (Minn.1990). The prosecutor's characterization of the appellant's testimony was clearly improper.

However, the mere fact that prosecutorial misconduct has occurred during the course of a trial does not, in and of itself, require a new trial. *State v. Scruggs,* 421 N.W.2d 707, 715–16 (Minn.1988). A new trial should be ordered only where the misconduct, viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that the defendant's right to a fair trial was denied. *Id.* at 716. In determining whether the prosecutorial misconduct was unduly prejudicial, the reviewing court should consider the closing argument as a whole, rather than focusing on selective phrases or remarks that may be taken out of context or given undue prominence. *State v. Walsh,* 495 N.W.2d 602, 607 (Minn.1993).

Even if an argument is in some respects out-of-bounds, it is normally regarded as harmless error unless the misconduct played a substantial part in influencing the jury's deliberations. *Id.* at 607. Further, defense counsel's failure to object or request curative instructions weighs against reversal. *State v. Brown,* 348 N.W.2d 743, 747 (Minn.1984).

In the present case, we conclude that a new trial is not warranted. The prosecutor's remarks, while error, were isolated incidents in the context of a lengthy and otherwise fairly tried matter. The state's evidence of guilt on the eleven counts on which the defendant was convicted was overwhelming. The defense counsel made no objection at the time of the comments. Under the standards established by our cases, although the prosecutor's comments were improper, the impropriety was harmless and nonprejudicial.

Appellant also contends that the trial court abused its discretion in admitting four autopsy photographs over the objections of defense counsel. The four photographs depicted the body as it was recovered from the scene and after it was washed. They showed the extensive decomposition to the head, neck and superior chest region, indicating the number of deep wounds to the body in this area, and the external genitalia and anal region, showing the number of stab wounds present as well as bruises. The appellant contends that the photographs 1) were not relevant to any material issue, 2) were unnecessary to legitimately assist the jury in understanding the injuries, 3) were cumulative to the medical examiner's testimony about those injuries and 4) were inflammatory beyond any possible probative value.

The admission of photographs at trial is in the discretion of the trial court and abuse of discretion must be shown to warrant reversal of the trial court's ruling. *State v. Daniels,* 361 N.W.2d 819, 828 (Minn.1985).

The standard for the admissibility of photographs was set by this court in *State v. De Zeler,* 230 Minn. 39, 41 N.W.2d 313 (1950) and summarized recently in *State v. Hummel,* 483 N.W.2d 68 (Minn.1992) as follows:

[I]t is within the trial court's discretion to admit photographs, even ghastly ones, so

long as they show something that a witness could describe and are material to some relevant issue.

*Id.* at 74. Such exhibits allow the jury to better visualize the crime scene and the extent and type of harm to the victim, which is material to the issues of intent and premeditation. *Id.* However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice under Minn.R.Evid. 403.

This case involved only 11 photographs. The trial court reviewed each photograph before admitting it, required an explanation from the medical examiner as to the probative value of each questionable photograph, and explicitly balanced its probative value against its potential for creating unfair prejudice. Thus, the court engaged in the required balancing test under Minn.R.Evid. 403, and did not abuse its discretion by admitting the photographs into evidence.

The defendant received a fair trial and was properly found guilty of first degree murder.

Affirmed.