**Daniel E. ANGUS, Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. A03–1690.

Supreme Court of Minnesota.

April 28, 2005.

Mark D. Nyvold, St. Paul, MN, for Appellant.

Mike Hatch, Attorney General, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, MN, for Respondent.

## OPINION

HANSON, Justice.

Appellant Daniel E. Angus was found guilty of two counts of first-degree murder and the lesser-included offense of second-degree murder as an accomplice to the drive-by shooting of Anthony Basta. Basta was shot in the back on April 26, 2000, as he rode his bicycle along Mississippi River Boulevard in Saint Paul. Angus did not file a direct appeal, but petitioned for postconviction relief. Angus now appeals the postconviction court's denial of relief and claims that he should be entitled to a new trial because: (1) the district court erred in its application of the *Batson* test by denying Angus' peremptory challenge of an African American veniremember and (2) the district court erred in admitting certain *Spreigl* evidence. We reverse.

On April 26, 2000, at approximately 10:00 p.m., 17–year–old Anthony Basta was shot as he rode his bicycle in the southbound bike lane on Mississippi River Boulevard in Saint Paul. Basta died just over 25 minutes later at Regions Hospital.

The Saint Paul Police Department obtained information that Dale Stewart had admitted to riding in the car used during the Basta shooting. The police traced Stewart to Angus' home where Stewart was living at that time. Shortly after the police interviewed Stewart, they arrested Angus outside his home.

Angus was interviewed by Sergeant Joseph Younghans. The interviews were audiotaped and played for the jury at Angus' trial. During the interrogations, Angus provided four different descriptions of his actions on the night of the homicide. He initially told the police that he, Stewart, and Jonathan McNeill had been driving around northeast Minneapolis and then returned to Saint Paul. He then stated that while they were "cruising down" Mississippi River Boulevard, Stewart unexpectedly pulled out a gun and shot Basta. Angus said he had been unaware that Stewart possessed the gun. He later stated that he had seen Stewart with the gun before the shooting, but did not believe the gun was loaded or that Stewart would shoot Basta. Later still, he admitted that the gun was his; that he, Stewart, and McNeill had talked about "first blood," a phrase referring to the first to kill someone; that they agreed that Stewart would be the one to achieve first blood; and that

he rode with Stewart and McNeill but hoped that Stewart would not shoot anyone.

Angus then described this sequence of events leading to the murder. McNeill, who was driving the car, pointed out Basta and said, "There's one." Angus responded, "Yeah, there's one." Stewart then said that he was "gonna get" the bicycle rider. McNeill made a U-turn and pulled into a side street. McNeill waited in the side street for a few moments, and then pulled up behind Basta. When the car was within a few feet of Basta, Stewart placed the gun outside the front passenger window and shot Basta.

Angus claimed that at the last second he told Stewart not to shoot. But Angus admitted watching Basta fall to the ground and laughing about the shooting. Angus acknowledged that throughout the evening he, Stewart, and McNeill continued to make jokes about Basta saying "ow" upon being shot.

Angus told Sergeant Younghans that the gun used in the shooting was at McNeill's apartment and directed the police to where the gun was located. The police went to McNeill's apartment where they seized a 9 mm handgun, which was later identified through ballistic tests as the weapon used to shoot Basta. Following Stewart's and Angus' statements, the police also arrested McNeill. All three men made statements to the police admitting their involvement.

Angus was indicted for aiding and abetting first-degree premeditated murder, under Minn.Stat. §§ 609.185, subd. 1, 609.05, and 609.11 (2004) (Count I); and aiding and abetting first-degree murder (drive-by shooting), under Minn.Stat. §§ 609.185, subd. 3, 609.05, and 609.11 (2004) (Count II). Stewart and McNeill were also indicted for two counts of first-degree murder—premeditation and drive-by shooting.

McNeill entered into a plea agreement with the state in which he agreed to testify against both Stewart and Angus in exchange for pleading guilty to the lesser offense of second-degree intentional murder. Stewart's case was tried first. McNeill testified at Stewart's trial. The jury found Stewart guilty of two counts of first-degree murder and the lesser-included offense of second-degree murder. The court then convicted Stewart of first-degree murder and sentenced him to life imprisonment. *State v. Stewart*, 643 N.W.2d 281, 292 (Minn.2002). After testifying against Stewart, McNeill was sentenced to 25 years in prison.

Angus' trial began on November 13, 2000, before the same judge who had presided over Stewart's trial. Jury voir dire was conducted by examining one venire-member at a time.[1] *See* Minn. R.Crim. P. 26.02, subd. 4(3)(c). During voir dire, Angus exercised a peremptory challenge against an African American male, venire-member # 38. The state objected to the challenge on the ground that it violated Minn. R.Crim. P. 26.02, subd. 6a, which prohibits a party from striking a venire-member based solely on the venire-member's race. Angus replied that the reason for the strike was that veniremember # 38 lacked credibility. After questioning veniremember # 38, the district court concluded that Angus' reason for challenging the veniremember was pretextual and sustained the state's objection. Veniremember # 38 was seated as the only minority member of the jury.

---

1. Three veniremembers who were African American were excused for cause before any questioning. They were codefendant Jonathan McNeill's mother, a former Saint Paul prosecutor, and a person who was removed by agreement because he lacked basic reading and language skills.

Before trial, as required under Minn. R.Crim. P. 7.02, the state gave notice that it would be offering *Spreigl* evidence of three prior bad acts by Angus.[2] The district court denied Angus' pretrial motion to exclude all *Spreigl* evidence, but reserved its final ruling until "the end of the state's case in chief."

In its opening statement, the state attempted to show that, as part of a plan to commit various criminal acts, Angus, Stewart, and McNeill had conspired to shoot someone on the evening Basta was shot. The state discussed how the three had laughed together after the shooting. Angus' opening statement countered by suggesting that McNeill was the instigator and leader of the group that night and that Angus was a bystander. The statement emphasized that McNeill bought the ammunition, decided where to drive, and encouraged the shooting. It portrayed Angus as a dreamer who fantasized and played games, comparing him to Peter Pan, "the boy that never grew up."

McNeill testified against Angus and described the times when he, Stewart, and Angus had driven around talking about robbing people, but that they had never actually robbed anyone. He explained how he and Stewart had discussed needing a gun to rob people and that Stewart had told him that Angus had a gun. McNeill stated that although the gun belonged to Angus, Stewart usually carried it. He further testified that Angus wanted to steal cars at "gunpoint" from people, and then sell the vehicles. He also testified how he, Stewart, and Angus had discussed "trying to take over" a part of town by making people pay Stewart, McNeill, and Angus for "protection."

McNeill then testified about the evening of Basta's shooting. He admitted that he drove the car, promoted the idea of "first blood," provided the ammunition, and first spotted Basta. But he explained that all three men had discussed shooting someone and that Angus had stated that it was easier to kill than to rob. He testified that Stewart and Angus were the ones who decided that he should turn around and follow Basta. He also testified that immediately before Stewart fired the gun, Angus did nothing to try to stop Stewart. McNeill stated that after Stewart shot Basta, Angus said he wanted to go to another place and shoot someone to achieve "second blood."

Sergeant Younghans testified about the defendants' interrogations and identified where McNeill's and Stewart's statements corroborated Angus' answers. The state offered testimony of Stewart's and Angus' friends, who said that Angus was more typically the leader of the group. The state's witnesses testified about Angus' activities with a group that dressed in military fatigues and played war games in area parks and that Angus was one of the group's highest-ranking leaders.

After the state concluded its case in chief, it renewed its motion for the admission of the *Spreigl* evidence to demonstrate Angus' intent for murder. The state argued that there was conflicting evidence from the only two eyewitnesses to the shooting and to what had been discussed in the car before Basta was shot: McNeill testified against Angus and his credibility was attacked, and Angus ar-

**2.** *"Spreigl* evidence is evidence of a defendant's prior crimes, wrongs, or acts, which would otherwise be inadmissible, but which the state can seek to have admitted for the limited purpose of showing motive, intent, absence of mistake, identity, or a common scheme or plan." *State v. Asfeld,* 662 N.W.2d 534, 542 (Minn.2003). *See* Minn. R. Evid. 404(b) and *State v. Spreigl,* 272 Minn. 488, 497, 139 N.W.2d 167, 173 (1965).

gued that he was merely acting out a fantasy and had no intentions of actually carrying through on the shooting. The state argued that evidence of Angus' past criminal conduct was necessary to show his "whole character" and to demonstrate that he was willing to follow through on criminal behavior. Angus objected, arguing that *Spreigl* evidence was unnecessary because the state had a strong case based on Angus' statement to the police and McNeill's testimony. Angus additionally argued that the state's real reason for offering the *Spreigl* evidence was to show Angus' character, an improper use of *Spreigl* evidence.

The district court allowed all three prior bad acts into evidence, stating that the acts had been shown by clear and convincing evidence, each was relevant to the charged crime, and the probative value of each outweighed any prejudice against Angus. Before testimony about each incident was presented, the court instructed jurors not to use the evidence for an improper purpose.

Angus did not testify. He called one witness, a former girlfriend of McNeill's who testified that McNeill had a reputation of being untruthful. The jury returned a guilty verdict on the two first-degree murder counts and the lesser-included count for second-degree murder. The court sentenced Angus to life in prison.

This appeal from the postconviction court's denial of relief is Angus' first appellate review of his conviction for first-degree murder. The issues before us are whether the district court erred in (1) sustaining the state's *Batson* objection to Angus' peremptory challenge of an African American veniremember or (2) admitting evidence of three prior incidents as *Spreigl* evidence.

## I.

■ We first address the state's *Batson* objection to Angus' peremptory strike of an African American veniremember. Angus argues that the state did not establish a prima facie case of racial discrimination and that the court incorrectly bypassed the first step of the *Batson* analysis. Angus also argues that he met his burden of showing a race-neutral reason for the peremptory challenge and that the court incorrectly determined that the reason was a pretext for racial discrimination.

The state argues that the district court properly found that Angus' peremptory challenge against veniremember # 38 was pretextual. The state contends that (1) Angus used an earlier peremptory challenge to strike an African American male who stated that he could be fair, (2) Angus did not explain to the court why a veniremember's "credibility" would make a juror less fair to appellant than another juror, and (3) the existence of a race-neutral reason to excuse the first African American prospective juror does not compel the conclusion that Angus did not also have a discriminatory intent in striking him.

The United States Supreme Court has long recognized that denying participation in the jury system based on a person's race is unconstitutional. *Strauder v. West Virginia*, 100 U.S. 303, 308, 25 L.Ed. 664 (1879). In *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Court determined that the state's use of a peremptory challenge to exclude a potential juror based solely on the potential juror's race violates the Equal Protection Clause in the Fourteenth Amendment to the United States Constitution. Later, the Court clarified that *Batson* also applied to a defendant's use of peremptory challenges based on race. *Georgia v. McCollum*, 505 U.S. 42, 46, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). The

Court emphasized one of the "multiple ends" that *Batson* was designed to address—the right of a juror not to be excluded from serving on a jury based on race. *Id.* at 48–49, 112 S.Ct. 2348 (citing *Powers v. Ohio*, 499 U.S. 400, 406, 409, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

In *Batson*, the Court set forth a three-part test for trial courts to follow when a party objects to a peremptory challenge.

> First, the [party challenging the strike] must make a prima facie showing that the [party who struck the juror] has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the [party who exercised the peremptory strike] to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the [challenger] has carried his burden of proving purposeful discrimination.

*State v. McRae*, 494 N.W.2d 252, 253 (Minn.1992) (citing *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and *Batson*, 476 U.S. at 79, 106 S.Ct. 1712). In *Hernandez*, the Court held that if a party proceeds past the first step by offering a race-neutral reason without questioning the objecting party's prima facie showing, the outcome of step one is moot. *State v. James*, 520 N.W.2d 399, 402 (Minn.1994) (citing *Hernandez*, 500 U.S. at 359, 111 S.Ct. 1859).

During jury voir dire, veniremember # 38 stated that he had heard about the Basta shooting on the television news only in passing, but that he did not focus on it. He explained that all he knew was that it was a drive-by shooting and that three men were involved and stated, "So I don't know a whole lot about it." Although he acknowledged that his hobby was to regularly read the entire newspaper and to cut out and keep interesting newspaper articles in a folder, he said he did not cut out any articles about the Basta shooting. When defense counsel asked whether he had read anything about the case, veniremember # 38 replied, "No, not at all." After asking several more questions, defense counsel exercised a peremptory challenge, striking veniremember # 38 from the jury.

The state objected to the peremptory challenge under Minn. R.Crim. P. 26.02, subd. 6a.[3] The state asserted that Angus'

**3.** Minnesota Rule of Criminal Procedure 26.02, subd. 6a(3), closely follows the three-part test announced by the Supreme Court in *Batson*.

> The trial court shall use a three-step process for evaluating a claim that any party has engaged in purposeful racial or gender discrimination in the exercise of its peremptory challenges:
> (a) First, the party making the objection must make a prima facie showing that the responding party has exercised its peremptory challenges on the basis of race or gender. If the objection was raised by the court on its own initiative then the court must initially determine, after such hearing as it deems appropriate, that there is a prima facie showing that the responding party has exercised its peremptory challenges on the basis of race or gender. If no

> prima facie showing is found, the objection shall be overruled.
> (b) Second, if the court determines that a prima facie showing has been made, the responding party must articulate a race-neutral or gender-neutral explanation, as applicable, for exercising the peremptory challenge(s) in question. If no race-neutral or gender-neutral explanation is articulated, the objection shall be sustained.
> (c) Third, if the court determines that a race-neutral or gender-neutral explanation has been articulated, the objecting party must prove that the proffered explanation is pretextual. If the objection was initially raised by the court, it shall determine, after such hearing as it deems appropriate, whether the peremptory challenge was exercised in a purposeful discriminatory manner on the basis of race or gender. If

peremptory challenge of veniremember # 38 was racially motivated, noting that Angus had previously struck an African American man, veniremember # 34. The state contended that there was nothing in veniremember # 38's answers that indicated a bias in favor of the state or any particular knowledge of the case. The district court did not determine whether a prima facie case of discrimination had been shown, but instead allowed the discussion to move to the second step of the *Batson* process.

Angus explained that he believed that veniremember # 38 lacked credibility because there had been numerous newspaper articles about the shooting and veniremember # 38's denial of having read anything about the case conflicted with his statements that he read the entire newspaper regularly. The state responded that Angus' conclusion was "reading a lot into [veniremember # 38's] answer" and that it should be assumed that, because veniremember # 38 was under oath, he was being forthright in his answers.

The court then asked several questions of veniremember # 38, attempting to clarify whether he had read anything about the case. The veniremember explained that he did not subscribe to or read a newspaper every day, but that when he did buy the newspaper, he "read the entire newspaper, but never read anything on this particular case." The veniremember clarified that he does not generally read articles on crime. The state then asked the veniremember whether he thought he would be able to decide the case only on facts presented in court and without sympathy or prejudice. The veniremember responded that he could.

After veniremember # 38 was again asked to leave the courtroom, the court explained that it had requestioned the veniremember to determine his credibility and that the court was satisfied that his answers during the second period of questioning were consistent with his previous answers. The state observed that Angus had passed on several jurors who had shown a far greater familiarity with the case than that of veniremember # 38. The state asserted: "so that doesn't seem to be the pertinent cause for their concern." Angus responded that the challenge had nothing to do with the veniremember's race and repeated that he was concerned about the veniremember's credibility and not with his knowledge of the case.

The district court ruled that Angus' race-neutral reason was not "sufficient" and that his peremptory strike did not survive the *Batson* objection. Angus' counsel was allowed to make an offer of proof by providing copies of the numerous articles that had appeared in the *St. Paul Pioneer Press* during the time that veniremember # 38 had admitted he had read the entire newspaper. Veniremember # 38 was seated as the twelfth juror and participated in the jury's deliberations and verdict.

■ The party who makes a *Batson* challenge can establish a prima facie case of racial discrimination in step one by showing that (1) one or more members of a racial group have been peremptorily excluded from the jury, and (2) circumstances of the case raise an inference that the exclusion was based on race. *State v. DeVerney*, 592 N.W.2d 837, 843 (Minn.

purposeful discrimination is proved the objection shall be sustained. If no purposeful discrimination is proved the objection shall be overruled.

Minn. R.Crim. P. 26.02, subd. 6a(3).

1999). Here, neither the state nor the court actually stated what circumstances provided the inference of discrimination that is necessary to establish a prima facie case in step one. As we have stated, the mere fact that the veniremember subject to the strike is a racial minority does not establish a prima facie case of discrimination. *State v. Reiners,* 664 N.W.2d 826, 831 (Minn.2003). Whether the circumstances of the case raise an inference of discrimination depends in part on the races of the defendant and the victim. *State v. Stewart,* 514 N.W.2d 559, 563 (Minn.1994). In *Stewart,* we said that "[t]here were no racial overtones to the case since both the defendant and the victim are white * * *." *Id.*

■ Both the defendant, Angus, and the victim, Basta, were white. The state identified no racial overtones to the case when it made its *Batson* objection. The state's only explanation was that veniremember #38 was the second African American peremptorily challenged by Angus. But this was not probative of discriminatory motives on Angus' part because the first African American veniremember stricken by Angus had admitted an obvious bias by stating that his close relationship to police meant that he might favor police testimony and he was afraid he could not be fair. No *Batson* objection was made to Angus' peremptory strike of that veniremember. The existence of a prior strike of a minority, based on race-neutral reasons that were not questioned, does not raise an inference that a subsequent strike of a minority was discriminatory.

■ The district court bypassed step one of the *Batson* analysis without identifying on the record any circumstance that would raise an inference of racial discrimination. It is true that any failure in step one to identify a circumstance that would raise an inference of racial discrimination

can be rectified in step three when race-neutral reasons given for a strike are examined. But the state and the district court both failed in step three to identify any circumstance that would raise an inference of racial discrimination. The court expressed concern that "this would be the second African American juror that would have been struck by peremptory challenge." But we have cautioned that the general desire to achieve a diverse jury cannot be the basis to sustain a *Batson* objection where the circumstances of the case do not support an inference that the party exercising the strike has a discriminatory motive. *See, e.g., State v. Everett,* 472 N.W.2d 864, 868–69 (Minn.1991); *see also Reiners,* 664 N.W.2d at 831.

■ The burden was on the state in step three to demonstrate that Angus' reason was pretextual of an underlying motive to discriminate. That demonstration of pretext implies a two-part analysis: (1) a demonstration that the proffered race-neutral reason is not the real reason for the strike and (2) a demonstration that the real reason was the race of the veniremember. One way to demonstrate the first part of pretext is to challenge the relevance or validity of the proffered race-neutral reason, but the failure of that reason does not demonstrate the second part, that the real reason was based on race. The state's successful attack on a defendant's race-neutral reason does not satisfy the state's burden to prove racial discrimination because it only begs the question as to the real reason for the strike. If the mere rejection of a defendant's race-neutral reason were deemed sufficient to support a *Batson* challenge, the effect would be to shift the burden to the defendant to prove that race was *not* the reason. Stated another way, the elimination of a defendant's race-neutral reason does not, by itself, support a presumption or even an inference

that the real reason was race. The state still must prove that the real reason was racial discrimination by identifying some circumstance that raises an inference of discrimination. If this has not been done in step one, then the state must do it in step three.

The problem in this case is that the state did not identify a race-based reason for Angus' strike in step one, and then in step three the state focused solely on the first part of the pretext analysis by attempting to demonstrate that Angus' race-neutral reason was not relevant or valid. In fact, the state attempted to shift the burden of proof in step three to Angus by arguing that Angus had failed to demonstrate how the peremptory challenge of veniremember # 38 did *not* show that Angus had a discriminatory intent.

The district court likewise addressed only the first part of the pretext analysis, the relevance of the race-neutral reason given by Angus that veniremember # 38 was not credible. The court determined that this reason was not relevant or valid because the court believed that the veniremember was credible. But after the court rejected Angus' race-neutral reason, the court was left with no reason for the strike; the court did not identify any circumstance that would supply the required inference that the real reason was racial discrimination. In fact, the court never made a finding that Angus' peremptory challenge of veniremember # 38 was based on race. The only finding was that Angus' stated reason for the strike was not "sufficient."

The dissent attempts to avoid this flaw by looking outside the record of the *Batson* hearing and beyond the circumstances identified by the state and by the district court. The dissent notes that the state's witness McNeill is African American and speculates that Angus might have been motivated by this circumstance to eliminate an African American veniremember. The problems with this analysis are several.

First, neither the state nor the court mentioned this circumstance, either in step one or step three of the *Batson* analysis. Second, because this circumstance was not mentioned, Angus had no opportunity to counter the suggestion that McNeill's race might raise an inference of discrimination. Third, and perhaps most important, the district court as the fact-finder at step three of the *Batson* analysis did not announce a finding that Angus had a discriminatory motive to strike veniremember # 38 because McNeill was to be a state's witness. It would be inappropriate for this court to speculate about what inference the district court might have drawn from a circumstance that was not called to its attention and which it did not mention. Although the dissent is correct that we give considerable deference to the district court's findings on the intent for striking a veniremember, no finding as to intent was made and our procedures do not allow us to create a record where none exists.

■ We conclude that the district court clearly erred when it sustained the state's *Batson* objection to the peremptory challenge of veniremember # 38. Where a district court erroneously sustains a *Batson* objection to a peremptory challenge and refuses to dismiss the stricken veniremember, the error undermines the basic "structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review." *Reiners,* 664 N.W.2d at 835 (quoting from *State v. Logan,* 535 N.W.2d 320, 324 (Minn.1995)). Accordingly, we reverse Angus' conviction and remand to the district court for a new trial.

## II.

Because we grant a new trial on *Batson* grounds, we need not decide whether the

district court's admission of *Spreigl* evidence was reversible error. But, to provide guidance for the new trial, we will address Angus' claim that the *Spreigl* evidence was not admissible.

In *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965), we confirmed our adherence "to the common-law rule excluding evidence connecting a defendant with other crimes, except for purposes of impeachment * * * if he takes the stand on his own behalf." *Id.* at 490, 139 N.W.2d at 169. We also confirmed our recognition of various "exceptions to the general exclusionary rule where evidence of prior crimes was admissible to show motive, to negative mistake, [or] to establish identity * * *." *Id.* at 491, 139 N.W.2d at 169. But because of our serious misgivings about prior misconduct evidence, we held that such evidence shall not be received in a criminal prosecution unless, within a reasonable time before trial, the state provides particularized notice of its intent to offer such evidence. *Id.* at 496–97, 139 N.W.2d at 173. Years later, the general exclusionary rule and its exceptions were incorporated into the rules of evidence, which provide:

> Evidence of another crime, wrong or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Minn. R. Evid. 404(b).

Through the many cases that have followed *Spreigl*, we have evolved a five-prong test the district court must follow when examining the admissibility of other bad act evidence:

(1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential prejudice to the defendant.

*State v. Asfeld*, 662 N.W.2d 534, 542 (Minn. 2003); *see also State v. Stewart*, 643 N.W.2d at 296.[4]

In *State v. Billstrom*, 276 Minn. 174, 149 N.W.2d 281 (1967), we added a necessity requirement where the *Spreigl* evidence is offered under the identity exception. We held:

> Evidence of other crimes is admissible only if the trial court finds the direct or circumstantial evidence of defendant's *identity* is otherwise weak or inadequate, and that it is necessary to support the state's burden of proof.

*Id.* at 178–79, 149 N.W.2d at 284 (emphasis added). Later, we expanded this necessity requirement to the other exceptions, so that the district court is to look at the weakness of the evidence of identity where identity is an issue and at the weakness of the state's case in general where the other exceptions are involved. *See, e.g., State v. Kennedy*, 585 N.W.2d 385, 392 (Minn. 1998); *State v. Slowinski*, 450 N.W.2d 107, 114 (Minn.1990); 11 Peter N. Thompson, *Minnesota Practice, Evidence* § 404.06, at p. 164 (3d ed.2001). Generally, we have addressed the weak issue/weak case requirement in the context of the fifth prong of the *Spreigl* test, when balancing the probative value of the evidence against

---

4. The requirement of notice has been incorporated in Minn. R.Crim. P. 7.02 and the requirement of clear and convincing evidence has been incorporated for criminal prosecutions in Minn. R. Evid. 404(b).

potential prejudice. *See, e.g., State v. Moorman,* 505 N.W.2d 593, 602 (Minn. 1993); *State v. DeWald,* 464 N.W.2d 500, 504 (Minn.1991); *see also State v. Bolte,* 530 N.W.2d 191, 197 (Minn.1995). In *Bolte,* we clarified what necessity means:

> "Need" for other-crime evidence is not necessarily the absence of sufficient other evidence to convict, nor does exclusion necessarily follow from the conclusion that the case is sufficient to go to the jury. A case may be sufficient to go to the jury and yet the evidence of other offenses may be needed because, as a practical matter, it is not clear that the jury will believe the state's other evidence bearing on the disputed issue.

530 N.W.2d at 197 n. 2. To assess the probative value and the need for the *Spreigl* evidence, the district court must identify the precise disputed fact to which the *Spreigl* evidence would be relevant. *Id.* at 197.

Angus argues that none of the three prior bad acts was relevant and that the prejudicial effect of each substantially outweighed its probative value. He also argues that evidence of one of the prior bad acts, describing a murder-for-hire scheme, was not clear and convincing.

The first *Spreigl* incident was described in the testimony of Amy Boettcher, a friend of Angus. Boettcher testified that in mid-November 1999, she and two friends, Joe Sherman and Scott Quick, went to Angus' house to watch videos. Another adult male, identified to Boettcher only as Raymond, was also at Angus' house. Boettcher and Sherman left very early the next morning, but stopped at a nearby grocery store. When the two were leaving the store, Angus, Quick, and Raymond confronted them in Army fatigues and forced them to walk with them to a nearby park. When the group reached the park, Angus directed Boettcher and Sher-man into the woods and instructed them to kneel on the ground and put their hands behind their heads. Angus told Raymond to hold a gun to Sherman's head and instructed Quick to search Sherman, ostensibly looking for a video he thought Boettcher and Sherman had taken with them when they left the house. After confirming that Boettcher and Sherman did not have the video, Angus searched Boettcher's purse and Sherman's jacket, wrote down information from their driver's licenses, and then told Boettcher and Sherman to leave before he and the others changed their minds about not shooting them. Boettcher told her father what had happened and he took her to the police station to report the incident. Angus was charged and convicted of making terroristic threats.

The second and third *Spreigl* incidents were described in the testimony of Bloomington Police Detective Edward Hanson, Tonya Achenbach, and Wendy Overbey. The incidents involved an alleged burglary and a murder-for-hire scheme.

Hanson testified that he investigated a residential burglary in April 2000 at the home of Andrew Achenbach. His investigation led him to Angus when Andrew's estranged wife, Tonya Achenbach, admitted that she had asked Stewart and Angus to steal a computer from her husband so that she could access e-mail messages to determine whether her husband was planning to take their child. On May 10, 2000, the Saint Paul Police Department notified Hanson that Angus was in custody. Hanson went to the police station and interviewed Angus. Angus told Hanson that he, Stewart, and Quick had taken the computer at the request of Tonya Achenbach. During the questioning, Angus also told Hanson that, prior to Tonya Achenbach approaching them about the burglary, Tonya had approached Angus and Stewart

about killing Andrew Achenbach for $1,000.

Tonya Achenbach testified about the murder-for-hire scheme. She explained that one evening in the early spring of 2000, she told Stewart and Angus that Andrew had beaten and raped her. She testified that Stewart and Angus became very angry and offered to kill her husband. She stated that she thought they were "crazy," but that she believed they were serious. Overbey testified that she heard an offer by Stewart and Angus to kill Andrew Achenbach, but stated that she did not believe that Stewart and Angus were serious about their offer.

We conclude that none of the prior bad act evidence should have been admitted on this record, for the reasons stated below.[5]

As a preliminary matter, we question whether the state has proven that the evidence was necessary in Angus' prosecution. The state's memorandum of law, submitted prior to trial, stated that the key issue was to be Angus' "intent" and argued that the prior bad acts would aid the jury in "determining whether Daniel Angus aided Dale Stewart in the present case and whether he was conspiring to kill someone or advocated against it or was an innocent bystander, helpless to prevent the death." The memorandum also stated that the evidence was admissible "to show absence of mistake or accident." The memorandum argued that the evidence was necessary because Angus asserted, in his taped statement, that he "was an unwilling participant in the murder," that he "at-

tempted to prevent the shooting," and that he "had no prior knowledge that Dale Stewart could actually do it."

Because Angus was being charged as an accomplice, the state was required only to show that he intentionally aided, advised, counseled, or conspired with others to commit the crime. Minn.Stat. § 609.05, subd. 1 (2004). In Angus' own statements to police, he acknowledged that the murder weapon was his, that he knew McNeill and Stewart had a plan to shoot someone, and that he said "Yeah, there's one" after McNeill identified Basta as the intended victim. Although he claimed that at the last second he told Stewart not to shoot, he admitted to laughing about the shooting afterward. Once having intentionally contributed to the plan for the shooting, Angus could escape accomplice liability only by abandoning the plan and making a reasonable effort to prevent the commission of the crime. Minn.Stat. § 609.05, subd. 3 (2004). Angus's own statement provides little support for a claim of abandonment, and McNeill denied that Angus had asked Stewart not to shoot. Given the risk that the jury might use *Spreigl* evidence for an improper purpose, its use should be reserved for cases where the evidence is more crucial to the state's case than here.

*The murder-for-hire scheme*

■ We addressed the identical issue of whether the murder-for-hire scheme was proper *Spreigl* evidence in the direct appeal of Angus' codefendant, Stewart. *See Stewart*, 643 N.W.2d at 297. We con-

---

5. Before the district court, the state argued that Angus had put his character in issue by developing character evidence in his cross-examination of the state's witnesses. Presumably, the state was relying on Minn. R. Evid. 405(b), which allows proof of specific instances of a person's conduct where the character of the person is an essential element of a defense. The district court did not admit the *Spreigl* evidence on that basis and the state does not develop that argument on appeal. We express no opinion on whether Angus did put his character in issue during this trial, and we likewise do not mean to foreclose the state from making any arguments for the admission of the *Spreigl* evidence that are not inconsistent with this opinion.

cluded that the admission of evidence of this murder-for-hire scheme was error because the state failed to prove an overt act in furtherance of the scheme. *Id.* We also concluded that the district court had improperly allowed the evidence to be used to demonstrate that the defendant had a character predisposition to commit the act of shooting Basta. *Id.*

The state argues that *Stewart* unnecessarily limited its focus to whether the evidence established that a completed crime had been committed, whereas Minn. R. Evid. 404(b) is not limited to proof of other crimes because it also allows proof of another "wrong, or act." We agree that it would be a mistake to read *Stewart* to require that the evidence of the prior act must always involve a crime or a completed crime. But, even if we considered the murder-for-hire scheme as a wrong or bad act, we would conclude that it was not sufficiently similar to the drive-by shooting of Basta to be probative of Angus' intent. An offer to kill an identified person for cash in response to that person's alleged bad acts bears no close relationship to shooting a stranger to earn "first blood." Further, the risk that the jury would use evidence of the murder-for-hire scheme for the improper purpose of proving Angus' propensity to commit crimes outweighs its probative value.

*Burglary and terroristic threats*

▮▮ Angus concedes that the burglary and terroristic threats incidents are shown by clear and convincing evidence. The admissibility of these two incidents turns on each incident's relevance and its probative value weighed against the danger of unfair prejudice. *See Asfeld,* 662 N.W.2d at 542; Minn. R. Evid. 403.

Angus argues that the terroristic threats incident is not relevant to the state's case and that it is highly prejudicial, thereby failing the *Spreigl* test's fourth and fifth

steps. We have held that to determine the relevance and admissibility of *Spreigl* evidence the district court should

> focus on the closeness of the relationship between the other crimes and the charged crimes in terms of time, place and modus operandi. The reason for this is that the closer the relationship, the greater is the relevance or probative value of the evidence and the lesser is the likelihood that the evidence will be used for an improper purpose.

*State v. Frisinger,* 484 N.W.2d 27, 31 (Minn.1992) (internal citation omitted); *see also State v. Profit,* 591 N.W.2d 451, 461 (Minn.1999).

There simply is no close relationship between making terroristic threats toward acquaintances and shooting a stranger on a bicycle. In the terroristic threats incident, Angus was accompanied by different companions, the victims were threatened with a gun but no one shot them, the victims were acquaintances and not strangers, and Angus clearly was in charge. The Basta shooting occurred 5 months later. Angus' companions were different, the evidence was that McNeill and not Angus directed the activities (McNeill testified that he decided where to drive and initiated the talk about who would have "first blood," and that Stewart chose to be the shooter), all three talked equally about potentially shooting a person and this time Stewart followed through, and Basta was a stranger.

Likewise, the burglary of an unoccupied home bears little relationship to a drive-by shooting. The state argues that the burglary was relevant to demonstrate that Angus would follow through on criminal behavior and not just fantasize about it. But using a criminal act to demonstrate a defendant's propensity to commit criminal acts is prohibited. Minn. R. Evid. 404(b). We conclude that on this record it was an

abuse of discretion to admit evidence of the burglary and terroristic threats.

Reversed and remanded for a new trial.

ANDERSON, G. BARRY, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. First, I disagree with the majority's holding that the district court erred when it sustained a *Batson* objection to Angus's peremptory challenge. The majority's conclusion that the court erred because the circumstances of the case did not raise an inference that the peremptory strike was based on race misapplies our case law and does not give proper deference to the district court's role as fact finder in determining whether a peremptory strike was racially motivated. Second, because the district court did not improperly admit evidence of Angus's prior bad acts to show his propensity to commit crimes, I disagree with the majority's analysis that the court erred when it admitted the *Spreigl* evidence of Angus's prior bad acts. Accordingly, I would affirm.

### I.

Whether a peremptory challenge is based on racial discrimination is a factual determination to be made by the district court. *State v. White,* 684 N.W.2d 500, 506 (Minn.2004). We have consistently given deference to the district court rulings on *Batson* issues, realizing that the record may not accurately reflect all relevant circumstances that may properly be considered. *Id.* The United States Supreme Court has acknowledged that a district court is uniquely situated to determine the challenging party's motivation in striking a veniremember by examining characteristics such as demeanor and credibility. *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Here, the majority has largely disregarded our case law, which states that "considerable deference must be given by a reviewing court to the trial court's finding on the issue of intent because the finding typically will turn largely on an evaluation by the trial court of credibility." *State v. Gaitan,* 536 N.W.2d 11, 16 (Minn.1995) (citing *Hernandez,* 500 U.S. at 366–69, 111 S.Ct. 1859); *see also State v. Taylor,* 650 N.W.2d 190, 200–01 (Minn.2002) ("[w]hether there is racial discrimination in the exercise of a peremptory challenge is a factual determination to be made by the district court and is entitled to great deference on review").

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court established a three-part test for courts to follow when a party objects to a peremptory challenge.

First, the [party challenging the strike] must make a prima facie showing that the [party who struck the juror] has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the [party who exercised the peremptory strike] to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the [challenger] has carried his burden of proving purposeful discrimination.

*State v. McRae,* 494 N.W.2d 252, 253 (Minn.1992) (citing *Hernandez* and *Batson*). The party who makes a *Batson* challenge can establish a prima facie case of racial discrimination by showing that (1) one or more members of a racial group

have been peremptorily excluded from the jury, and (2) circumstances of the case raise an inference that the exclusion was based on race. *State v. DeVerney*, 592 N.W.2d 837, 843 (Minn.1999). The first requirement has clearly been met here—veniremember # 38 was the second African–American veniremember whom Angus struck. The district court stated its awareness that the first requirement had been met. The court also stated its "concern that there not be a racial basis for striking a juror."

While the district court did not explicitly state that a prima facie case had been established, the outcome of step one was rendered moot because Angus proceeded past the first step by offering a race-neutral reason for striking the prospective juror without questioning the state's prima facie showing. *State v. James*, 520 N.W.2d 399, 402 (Minn.1994) (citing *Hernandez*, 500 U.S. at 359, 111 S.Ct. 1859); *see also State v. Scott*, 493 N.W.2d 546, 548 (1992) (holding that "[b]ecause the trial court ruled on the ultimate question of intentional discrimination, the question whether the [party challenging the strike] made a prima facie showing is moot.").[1] More particularly, when the state objected to Angus's peremptory strike of veniremember # 38 as racially motivated, the court requested that Angus respond. Angus did not question the state's prima facie showing. Rather, he stated that his race-neutral explanation was that he did not find credible the veniremember's answers that he had not read anything about this case. The court then questioned venire-

member # 38 to determine whether Angus's explanation was pretextual. After extensive questioning, the court found that the veniremember's answers were candid and consistent. The court thus determined that the defense's explanation that veniremember # 38's answers were not credible was pretextual based on the court's own inquiry into the consistency of veniremember # 38's answers. "A juror cannot legitimately be struck from service for being qualified to serve—that is, for being impartial and unbiased." *Taylor*, 650 N.W.2d at 211 (Page, J., dissenting in part).

Furthermore, though not necessary to reach the conclusion that the district court did not err because Angus proceeded to step two of the *Batson* three-step test, the circumstances in this case raise an inference of discriminatory exclusion. Jonathan McNeill, the state's key witness, is African American—the same race as veniremember # 38—and is the only African American charged with the shooting of Basta. *See People v. Jones*, 185 Ill.App.3d 208, 133 Ill.Dec. 324, 541 N.E.2d 161, 166 (1989); *see also Powers v. Ohio*, 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (noting that the race of the defendant is not always relevant, "for race prejudice stems from various causes and may manifest itself in different forms."). McNeill was a key witness for the state who provided a participant's eyewitness testimony as well as statements contradicting what Angus had told the police. Further, having just presided over Stewart's trial less than three weeks earlier, the

1. The majority misstates our conclusion in *State v. Stewart*, in which we determined that no racial overtones existed where both the defendant and the victim were white and the type of questions asked of the Native American venireperson struck mirrored those asked of other jurors. 514 N.W.2d 559, 563 (Minn. 1994). In *Stewart*, our holding on *Batson* was

not based on the absence of racial overtones. We concluded that "because the trial court proceeded to the second step in the [*Batson* ] process, we need not address whether appellant established a prima facie case of the discriminatory use of the peremptory strike." *Id.*

presiding judge in Angus's case already knew the circumstances that surrounded the trial and what McNeill's testimony was likely to be.

Here, after extensive questioning of the challenged veniremember, the district court concluded that Angus's reason for exercising a peremptory challenge was based on the veniremember's race and therefore unconstitutional. But the majority is concerned that the court failed to make a sufficient record of its findings. While I agree that district courts should make particular findings on *Batson* challenges and should go through each of the three steps, we have not stated that particularized findings on the record are absolutely required. *See State v. Reiners,* 664 N.W.2d 826, 832 (Minn.2003) ("observ[ing]" that it is "important" for the district court to analyze each of the steps).

I am sympathetic to the majority's desire to have district courts precisely follow the three-step process first articulated by the Supreme Court in *Batson;* but, in its attempt to achieve this goal, the majority ignores a well-established body of law. *See Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859; *James,* 520 N.W.2d at 402; *Scott,* 493 N.W.2d at 548. In its attempt to get around *Hernandez, James,* and *Scott,* the majority fundamentally alters the *Batson* test. *Hernandez* renders step one of *Batson* moot if the party who exercised the peremptory strike offers a step-two race-neutral reason for striking the veniremember without first challenging the prima facie showing. 500 U.S. at 359, 111 S.Ct. 1859. But the majority ignores *Hernandez* when it inserts step one of *Batson* into step three in cases where step one was rendered moot.

The majority essentially makes the third step of *Batson* into a two-part test by requiring that the district court first find that the response in step two is pretextual

and then, second, explicitly state on the record that the challenging party has made a prima facie case of racial discrimination. Under *Batson,* however, step three specifically requires the court to determine whether the state has carried its burden of proving purposeful discrimination, which the court does when it determines whether the reason given in step two is pretextual. *See Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859 (stating that the "decisive question" in a typical peremptory challenge inquiry "will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."). If the court determines, as it did here, that the reason given in step two is pretextual, then under step three the court may determine that the state has established purposeful discrimination. By reversing the district court and ordering a new trial, the majority has ignored prior case law that provides that, under the facts and circumstances of a case such as the one before us today, step one is moot. The majority then inexplicably and needlessly confuses this area of the law by converting step three of *Batson* into a two-part test.

After applying our prior case law, giving proper deference to the district court's ability to observe the participants and examining the entire record, I conclude that the court did not abuse its discretion when it found that Angus's use of the peremptory challenge was a pretext for racial discrimination.

## II.

Although the majority's analysis regarding the *Spreigl* evidence is offered only to guide the district court in the new trial, I conclude it is necessary to address the majority's determination that the court erred by admitting Angus's three prior bad acts because the jury might use the

bad acts for the improper purpose of proving Angus's propensity to commit crime. I conclude that the court did not err because the three *Spreigl* incidents were necessary to prove that Angus had the intent to kill Anthony Basta.

A defendant's prior crimes, wrongs, or acts are not admissible "to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b). But prior acts may be admissible for the limited purpose of showing "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* In *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965), we articulated the five-prong test the district court must undertake when examining the admissibility of evidence under Rule 404(b):

> (1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential prejudice to the defendant.

*State v. Asfeld,* 662 N.W.2d 534, 542 (Minn. 2003). Angus does not dispute that the state has met the first two prongs of the test concerning notice of and purpose for the *Spreigl* acts. Angus also concedes that two of the *Spreigl* acts, the burglary and the terroristic threats incidents, were shown by clear and convincing evidence (third prong). I would conclude that the murder-for-hire scheme, as testified to by Tonya Achenbach and supported by the burglary, was proven by clear and convincing evidence; but I will focus my analysis on the fourth prong (relevance) and the fifth prong (prejudice).

The majority questions the relevance of the *Spreigl* evidence by stating that the relationship between Angus's three prior bad acts and Basta's shooting is not sufficiently close for the evidence to be admitted under *Spreigl.* I disagree. Here, the *Spreigl* evidence was introduced to rebut Angus's claim that he lacked the intent to commit the murder. At the *Spreigl* hearing, the state argued that Angus had attempted to portray himself as "as a dreamer, somebody who comes up with ideas and schemes, but doesn't follow through on them." The state contended that the burglary and murder-for-hire evidence was necessary to show that Angus could form the intent that he claimed he could not have formed. The state argued that the terroristic threats evidence was relevant and admissible under several of the prongs of Rule 404(b) to show that Angus had directed others to do criminal activity on his behalf. The district court found that proof for each of the three acts was clear and convincing and admitted the evidence to help the jury determine Angus's intent: "did he conspire to kill or was he an innocent bystander as has been the defense position?"

We have stated that the district court may determine the relevancy of *Spreigl* evidence by considering "the issues in the case, the reasons and need for the evidence, and whether there is a sufficiently close relationship between the charged offense and the *Spreigl* offense in time, place, or modus operandi." *Pierson v. State,* 637 N.W.2d 571, 580 (Minn.2002). The *Spreigl* incident, however, need not be identical to the charged offense nor must it be proximate in time if other factors indicate clear relevancy. *State v. Washington,* 693 N.W.2d 195, 203 (Minn.2005); *Asfeld,* 662 N.W.2d at 543. In *State v. Berry,* we upheld the admission of three prior incidents "which bore little resemblance to

each other or to the charged offense of first-degree premeditated murder" because they showed the " 'similarity of the way [the defendant] behaved when trying to maintain control of the people with whom he worked.' " *Asfeld*, 662 N.W.2d at 543 (quoting *State v. Berry*, 484 N.W.2d 14, 17 (Minn.1992)). In *Berry*, we said,

> [t]he *Spreigl* evidence was necessary to prove that Berry was not just blowing off steam, but in fact, carried out his threats. It filled in the picture of Berry as a man who was not well disposed to those who snitched on him, who threatened others verbally and physically, and who carried out his threats.

*Berry*, 484 N.W.2d at 17.[2] Thus, while a close relationship under *Spreigl* includes similar events and proximity in time, it also includes prior acts that show the defendant's ability to form an intent he claims he could not have formed. This is not character evidence to show that the defendant is a bad person, but the permissible use of prior bad acts to show intent, knowledge, and absence of mistake or accident. Minn. R. Evid. 404(b).

Angus's intent on the night of the shooting was crucial to the state in demonstrating that Angus was not just an innocent bystander and had not attempted to dissuade Stewart from shooting Basta. While the burglary did not involve a threat to another person, the evidence was rele-vant in countering Angus's claim that he only fantasized about criminal behavior, but would never follow through on it. The terroristic threats were against other persons and involved a gun and another person who wielded a gun at Angus's direction. Angus directed Raymond to show the gun to Boettcher and Sherman and to hold the gun to Sherman's head. The testimony demonstrated that Angus was in control of the situation. Again, the relevance of this evidence becomes apparent when juxtaposed against Angus's defense theory that he was an immature "Peter Pan" who had a rich "fantasy life."[3]

The analysis must also determine whether the probative value of the *Spreigl* evidence is substantially outweighed by the potential for unfair prejudice. *Pierson*, 637 N.W.2d at 580; Minn. R. Evid. 403. In *State v. Bolte*, we reiterated that prejudice "does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." 530 N.W.2d 191, 197 n. 3 (Minn.1995) (quoting *State v. Cermak*, 365 N.W.2d 243, 247 n. 2 (Minn.1985) (in turn quoting 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure—Evidence* § 5215, at 274–75 (1978))).

---

2. The three prior incidents in *Berry* were (1) a house break-in in which a gun may have been fired; (2) threats by Berry against a woman who he believed had "snitched" on him; and (3) threats and pointing a gun at the head of an acquaintance. *Berry*, 484 N.W.2d at 16–17.

3. I also disagree with the majority's analysis that Angus could escape accomplice liability only by abandoning the plan and making a reasonable effort to prevent the murder. The majority's analysis is correct only if Angus had the requisite intent to be an accomplice in the first place. Minnesota Statutes § 609.05, subd. 1 (2004), states, "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." To prove accomplice liability, the state must show that the defendant played a knowing role in committing the crime, as distinguished from mere presence, inaction, knowledge, or passive acquiescence. *State v. Gates*, 615 N.W.2d 331, 337 (Minn.2000). If Angus had no intent, he could not be an accomplice.

The state's request for the *Spreigl* evidence was not for illegitimate purposes. In opposition to the picture painted by Angus, the *Spreigl* evidence was needed to show that Angus was capable of actively planning and carrying out criminal activity, that others would follow his instructions, and that he had the requisite, intent and capability to follow through on. his plans and words. The *Spreigl* evidence rebuts Angus's depiction of himself as an inactive bystander during the shooting. It supports the state's contention that Angus's initial leadership influenced Stewart to shoot Basta. Moreover, the actions taken by the district court minimized the potential for this evidence to persuade by illegitimate means. The court held a hearing on the evidence and then withheld its decision until the end of the state's case. After permitting the state to use the evidence, the court gave the jury cautionary instructions both when the *Spreigl* evidence was introduced and again at the close of the trial. Therefore, I would conclude that the admission of the state's *Spreigl* evidence was for a proper purpose and that its probative value was not substantially outweighed by the danger of unfair prejudice.

For all of the foregoing reasons, I would affirm the result reached in the district court.

Finally, I also join in the observations and sentiments expressed by Justice Russell A. Anderson in his separate dissent.

ANDERSON, RUSSELL A., Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson, but write separately to point out the irony that, applying *Batson*, a new trial has been ordered because an African American juror, subjected to peremptory challenge, was permitted to sit on the jury.

In my view, the majority has elevated the right to peremptory challenge over the right established by the Fourteenth Amendment to the United States Constitution to prevent the use of a peremptory challenge to exclude persons from the jury solely based on race. I have the same concerns as those I expressed in *State v. Reiners*, 664 N.W.2d 826, 841–45 (Minn. 2003) (Anderson, Russell A., J., dissenting).

The state objected to the peremptory challenge on the ground that the challenge was racially motivated. The district court asked Angus for a response, which Angus provided without questioning the state's prima facie showing. Angus stated that the prospective juror's credibility was the basis for the strike. After extensively questioning the prospective juror personally, the district court sustained the objection, determining that the credibility of the prospective juror was not a race-neutral explanation in the context of this voir dire. The court concluded that Angus' race-neutral explanation was not "sufficient," but a successful *Batson* challenge should not depend on the court's use of particular magic words. The court's detailed questioning of the juror to determine whether Angus' explanation was a pretext for discrimination supports the court's ruling even though the court failed to explicitly say that the state had carried its burden of proving purposeful discrimination.

While the district court did not precisely follow *Batson*'s three-step analysis, it is implicit from this record that the challenge to this juror established a prima facie showing of racial discrimination under step one of *Batson*. By answering the court's request for a race-neutral explanation, Angus as much conceded the inference of racial bias. By sustaining the objection to the challenge, which was based on the state's assertion of pretextual racial dis-

crimination, the court implicitly determined that the strike was pretextual racial discrimination. In determining whether Angus' strike was racially based, the court must consider "all the relevant facts bearing on the issue." *State v. Gaitan,* 536 N.W.2d 11, 15 (Minn.1995). Where credibility is such a critical consideration in determining pretext, I would give deference to the district court decision, as we have said we must. *See, e.g., State v. Martin,* 614 N.W.2d 214, 222 (Minn.2000).